UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD REYNOLDS,

                Plaintiff,

                                                      CASE NO. 04-71361
v.                                         HONORABLE PAUL D. BORMAN

LEAR CORPORATION,

                Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**BACKGROUND:**

       Richard Reynolds ("Plaintiff") brings forth four claims against Lear:

(1)      Age Discrimination under the Age Discrimination in Employment Act

           ("ADEA");

(2)      Age Discrimination under the Michigan Elliott-Larsen Civil Rights Act

           ("ELCRA); or in the alternative,

(3)      Breach of Contract;

(4)      Promissory Estoppel.

(Plaintiff's Complaint).

       Plaintiff began working for Lear in 1975 as a plant manager. (Plaintiff's Dep. at 54, 61).

Plaintiff left Lear in 1983 to work for a different company. (*Id.* at 68). Plaintiff returned to Lear

in 1991 as a human resource manager in Mendon, Michigan. (*Id.* at 77, 69). Plaintiff completed

an application form which provided that he was an at-will employee. (*Id.* at 74-75, 79-80).

1

Plaintiff remained at Lear until March, 2002.  (*Id.* at 99).

In the fall, 2001, Plaintiff told his supervisor Carl Suiter that he was planning on retiring in March 2002.  Plaintiff completed a retirement benefits form on November 13, 2001, and indicated that his last day of work would be February 28, 2002.  (Defendant's Motion, Ex. B). Plaintiff testified that he voluntarily retired from Lear.  (Plaintiff's Dep. at 103).

Approximately three weeks after Plaintiff began his retirement, Lear contacted him and asked if he would be interested in completing a short term project in May or June, 2002 as the human resource manager for a plant that was closing in Marlette, Michigan.  (*Id.* at 109-111). Plaintiff told Charlie Ruda that he would be interested in the project.  (*Id.*).

Plaintiff requested that Lear change his employment status from retired to an unpaid leave of absence so that he could continue to receive credit for pension purposes and Lear would continue to pay his health benefits.  (*Id.* at 111).  Suiter approved this accommodation and Plaintiff agreed to come back to Lear to complete the project.  (*Id.* at 111, 116).

Plaintiff returned from Florida in April 2002.  (*Id.* at 113, 117).  Ruda told Plaintiff that the human resource position would last from the beginning of April, 2002 through the end of June, 2002, when the Marlette plant was scheduled to close.  (*Id.* at 112).  Plaintiff testified at the point he started this project, he understood that he would return to his retired status at the end of this temporary project and not be entitled to any type of severance plan.  (*Id.* at 115-116).

In early May, 2002, at the direction of Suiter, Ruda asked Plaintiff whether he would be interested in another temporary human resource project in Bourbon, Indiana, where another plant was set to close.  (*Id.* at 118-119).  Plaintiff told Ruda he was interested and Ruda said "fine, plan on it."  (*Id.* at 118-119, 126).  Plaintiff contends that based on this conversation he and his

2

wife cancelled extensive vacation plans to make a 7-8 month trip across the West and Mid-West with another couple. (*Id.* at 113, 116, 132). A few weeks later, Ruda informed Plaintiff that the project was no longer available because the incumbent human resource manager was no longer leaving. (*Id.* at 133).

Plaintiff then called the Mendon facility and asked if they had a temporary project he could complete until Suiter offered him another position. (*Id.* at 122). The assistant plant manager assigned Plaintiff to a two to four week project. (*Id.* Defendant's Motion, Ex. D). Two weeks into this project, Plaintiff called Ruda and asked if he had any additional temporary assignments, and Ruda offered Plaintiff an assignment in Madisonville, Kentucky. (*Id.* at 131-132). Plaintiff accepted the Madisonville offer. Plaintiff worked on the Mendon project until July 21, 2002. (*Id.* at 131, 134).

Plaintiff reported to Madisonville in late July 2002. (*Id.* at 134). Plaintiff was asked to assist the incumbent human resource manager because she was having trouble with her job responsibilities. (*Id.* at 132, 134-135). Two weeks after Plaintiff arrived, Lear terminated the incumbent manager and Suiter asked Plaintiff to assume her responsibilities until a permanent replacement could be secured. (*Id.* at 137, 151). In September, 2002, Suiter selected an existing Lear employee to fill the permanent human resource position in Madisonville. (*Id.* at 138-140). Plaintiff finished working on the Madisonville project on October 12, 2003. (*Id.* at 150).

Plaintiff testified that on October 2, 2002, he informed Ruda that he could not afford to retire and he would be interested in a full-time permanent position with Lear. (*Id.* at 142). Plaintiff testified:

I said I couldn't afford to retire. That - I said, you know, whenever there is an employee we don't want, we throw money at him. The more undesirable you are, the more money

you get.  How about taking care of the good guys.  I have been a good, loyal employee.  I
have had Lear blood going through my veins.  How about could you give me my full
pension at age 62 as though I was 65.

(*Id.* at 142).

Carl Suiter told Charlie Ruda to make it a priority to find Plaintiff a permanent position

with Lear:

Q.  Did you have a conversation with Charlies Ruda about Mr. Reynolds' desire to stay
on full time, permanently, with the company?

A.  I instructed Charlie to do whatever we could to find a spot for him, if we could.

Q.  To find a full-time, permanent spot?

A.  Uh-huh.  If he could.

(Suiter Dep. at 33).

At this point, Plaintiff testified that Ruda made no promises to him, and told him he

would "see what we can do."  (*Id.* at 144, 152).

A month later, Plaintiff contacted Suiter about his status with Lear, and Suiter told him

he "had been terminated as of October 15, and that [he] should get something from COBRA

anytime," but Lear was still looking for a permanent position for him.  (*Id.* at 156-157).  After

this, Plaintiff applied and received unemployment benefits.  (*Id.* at 182).

Plaintiff testified that he was on "standby ready for a call ... it was a constant thinking

about it, wondering when they're going to call; mentally prepared."  (*Id.* at 185).

Plaintiff testified that Suiter never promised him a position with Lear.  (*Id.* at 164).

In November, 2002, Suiter directed to Ruda to ask Plaintiff if he would be interested in a

permanent position at a joint-venture on the East Coast.  (*Id.* at 160).  Plaintiff testified that he

was not interested because the pay was too low and the cost of living on the East Coast was too

4

high.  (*Id.* at 54).  Carl Suiter also testified that Plaintiff was offered a human resource manager position at a Lear Plant in the Chicago area, starting at a salary of $53,000.00 per year but Plaintiff was not interested because the salary level was too low.  (Suiter Dep. at 34-35).[1]

Plaintiff testified that after he discussed the East Coast joint-venture position with Suiter, he did not have any further discussions with anyone from Lear about any other employment opportunities.  (*Id.* at 164).

On November 10, 2004, Plaintiff filed a charge of age discrimination with the federal Equal Employment Opportunity Commission ("EEOC").  (Defendant's Motion, Ex. G).  The EEOC issued Plaintiff a Right to Sue letter on January 15, 2004.  Plaintiff filed the instant complaint on April 12, 2004.  (*Id.* Ex. H).  Lear filed its motion for summary judgment on April 11, 2005.  Plaintiff responded on May 4, 2005.  Lear replied on May 16, 2005.  Oral argument was held on July 14, 2005.

**ARGUMENTS:**

1.    Lear's Argument

Lear argues that Plaintiff's breach of contract claim fails because Plaintiff was an at-will employee, and admits that Lear kept every promise made to him.  (Defendant's Motion, at 10).  Lear also argues that Plaintiff's promissory estoppel claim fails because Lear did not make an actionable promise or alternatively Plaintiff cannot show that he reasonably and detrimentally relied on such promises.  (*Id.*).  Lear contends that Plaintiff's ADEA claim should be dismissed

---

[1]Defendant's counsel at oral argument deemed this alleged offer of employment immaterial for purposes of the instant motion.  On the other hand, Plaintiff disputes that he was offered this position, and contends that it is pertinent to Defendant's motion because Lear hired a similarly situated employee, Carrie Robards, 33 years old, as the human resource manager for the Chicago Lear facility.

5

because his charge with the EEOC was untimely. (*Id.* at 13). Lear further contends that Plaintiff's age discrimination claims fail because Plaintiff cannot show that he was discriminated against after he returned from his voluntary retirement. (*Id.* at 14).

       2.     Plaintiff's Argument

Plaintiff initially argues that his EEOC charge was timely because Lear's decision that it considered him retired was not communicated to him any earlier than May 15, 2003. (Plaintiff's Response at 7). Plaintiff also argues that he has established a prima facie case for his age discrimination claims because he was involuntarily retired on October 15, 2002, and there was a similarly situated employee who was treated less favorable than he because of her age. (*Id.*). Plaintiff argues, in the alternative, that Lear breached a short term employment contract based upon explicit promises by Charlie Ruda. (*Id.* at 11-12). Plaintiff further argues that he has met the elements for promissory estoppel based upon Ruda's promise and his cancellation of his extensive travel plans. (*Id.* at 12).

## ANALYSIS:

## 1.    Standard

  Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

*Id.* at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires that non-moving party to introduce "evidence of

evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see also Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

**B.    Discussion**

**1.    Plaintiff's Breach of Contract and Promissory Estoppel Claim**

The Court grants Defendant's Motion for Summary Judgment on Plaintiff's Breach of Contract claim. "It is well settled in Michigan that employment contracts for an indefinite term are presumptively terminable at the will of either party for any reason or no reason at all." *Rood v. General Dynamics Corp.,* 444 Mich. 107, 116 (1993). To overcome the presumption of at-will employment, a plaintiff must present sufficient evidence to show either a contract provision for a definite term of employment, or one that forbids discharge absent just cause. *Scuderi v. Monumental Life Ins. Co.,* 344 F.Supp.2d 584, 591 (E.D. Mich. 2004). Under Michigan contract law, courts have recognized three ways for a plaintiff to prove such contractual terms: (1) proof of "a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause"; (2) an express agreement, either written or oral, regarding job security that is clear and unequivocal; or (3) a contractual provision, implied at law, where an employer's policies and procedures instill a "legitimate expectation" of job security. (*Rood* at 117).

Plaintiff contends that a short term contract to work for Lear existed through December 31, 2002 based on his testimony regarding his conversation with Ruda and the Bourbon assignment: "[h]e wanted me to do it; I accepted, and he said "Fine plan on it." (Plaintiff's Dep. at 126). However, Plaintiff further testified that within two weeks of this time, he was told that the Bourbon job was no longer a possibility:

8

Q. Well, your understanding was at the time you were planning to go to Bourbon, the guy in Bourbon wasn't leaving, right?

A. But they were still working on it....

Q. But you knew that was not a guarantee?

A. At that time, yes, it was still up in the air.

Q. For some time in May, from May 1st up until some period of time in May, you thought it was going to happen?

A. Correct.

Q. Mr. Ruda never promised you any other particular position, did he?

A. He said he would find something for me.

Q. Did he say he would would or did he say he would look for something?

A. He said he would look for something.

(Plaintiff's Dep. 126-127). The Court finds that a plain reading of Plaintiff's deposition in its entirety establishes that Plaintiff was an at-will employee and Lear did not make a clear and definite promise of future employment as required by Michigan law regarding the Bourbon job or any other position with Lear. The Court grants Defendant's Motion for Summary Judgment on Plaintiff's breach of contract claim. As Plaintiff testified:

Q. Carl Suiter or Charlie Ruda had never promised you that you'd always get another position had they?

A. As far as saying, 'I promise you you will get this,' no.

(*Id.* at 126).

The Court also finds that Plaintiff's promissory estoppel claim fails because the record provides that Lear never made a clear and definite promise to Plaintiff. There is a threshold requirement in Michigan that the oral promise relied on must be definite and clear. *Novak v.*

9

*Nationwide Mutual Ins. Co.,* 235 Mich.App. 675 (1999). The elements of promissory estoppel are: (1) a promise; (2) that the promisor should have reasonably expected to include action of a definite and substantial character on the part of the promisee; and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if justice is to be avoided. *Industrial Maxifreight Services, LLC v. Tenneco Automotive Operating,* 182 F.Supp. 2d 630, 634 (W.D. Mich. 2002). Promissory estoppel is based on the premise that a particular promise must be enforced to avoid an injustice. (*Id.*). As noted above, the Court finds that Lear did not make an actionable promise to Plaintiff.

The Court further finds that Plaintiff has not established that he materially altered his position in reliance on the alleged promises. Plaintiff contends that he put his retirement plans on hold and cancelled his extensive travel plans. The Court, however, finds that Plaintiff's testimony reveals that he did not have definite travel plans and did not suffer any damage as a result of canceling them. Plaintiff testified to this issue as follows:

Q. Did you have any other plans for what you were going to do in 2002 other than head back north in April?

A. Yes. I had planned that fall to go on a trip with my brother-in-law and his wife from California, two motorhomes, and spend seven or eight months traveling West and Midwest.

Q. When did you make those plans?

A. Probably January, February. They were plans made over the phone.

Q. And when you say the fall, had you figured out exactly when you were going to leave?

A. We planned on leaving around August or September.

Q. And the plans were made in January or February of 2002?

10

A.  Yes.

Q.  Did you have to pay any money in advance for that?

A.  No.

(*Id.* at 112-113).  Plaintiff further testified:

Q.  Did you have any plans because you weren't going to Bourbon?

A.  I had already changed my plans.  I was open.

Q.  And the trip your brother-in-law was supposed to take place in the fall?

A.  Going to be in the August, September time frame.

Q.  And when did you cancel it?

A.  In May.

Q.  Do you know what arrangements had been made for the trip as of May?

A.  Just that we had set aside that time and we were to meet and start traveling, going to Yellowstone, places like that.

Q.  Was there anything that would preclude you the first of July from saying we're back on?

A.  I didn't ask him if he'd changed his plans?

Q.  So you don't know if he's changed his plans?

A.  I didn't ask him.

(*Id.* at 132-133).

Based on Plaintiff's testimony, the Court finds that he cannot show that he materially changed his position based on his belief that Lear would find him temporary positions through December 31, 2002.  The Court finds that to the extent that Plaintiff relied upon Lear's statements, he did not suffer any financial loss and did not attempt to resurrect his travel plans

11

after he learned the Bourbon job was no longer an option.  Therefore, the Court grants

Defendant's Motion for Summary Judgment on Plaintiff's promissory estoppel claim because

Plaintiff cannot show that Defendant made a promise from which he materially changed his

position.

      **2.**      **Plaintiff's Age Discrimination Claims**

               **a.**      **Plaintiff Failed to Timely File his Charge of Discrimination with the EEOC**

Defendant initially contends that Plaintiff failed to exhaust his administrative remedies.

Before filing a civil action under the ADEA, an individual must file a charge of discrimination

with the EEOC.  29 U.S.C. §626(f).  Filing a charge with the EEOC and obtaining a right to sue

letter are prerequisites to filing suit in federal court.  *Lewis v. Harper Hospital,* 241 F.Supp.2d

769, 771 (E.D. Mich. 2002)(citing *Rivers v. Barberton Bd. of Educ.,* 143 F.3d 1029 (6th Cir.

1998)).  In deferral states, including Michigan, claimants have 300 days after the alleged

unlawful act to file an ADEA charge provided they have instituted proceedings with a state or

local agency with authority to grant or seek relief from such a practice.  (*Id.* (citing 42 U.S.C.

§2000e-5(e)(1)).   The Sixth Circuit has provided:

> The United States Supreme Court has held that the limitations period does not begin to
> run on a claim for employment discrimination until an employer makes and
> communicates a final decision to the employee.  Once the employee is aware or
> reasonably should be aware of the employer's decision, the limitation period commences.

*Amini v. Oberlin College,* 259 F.3d 493, 498 (6th Cir. 2001) (citing *Delaware State Coll. v. Ricks,*

449 U.S. 250, 258 (1980).

Plaintiff filed his EEOC charge on November 10, 2003.  Defendant points to the October

2, 2002 correspondence with Charlie Ruda in which he told Plaintiff that they did not have any

further positions for him.  Defendant further points to the November 1, 2002, communication by Carl Suiter where he told Plaintiff "he had been terminated as of October 15, and that [he] should get something from COBRA anytime."  Defendant contends that at this point, he was required to file his charge with the EEOC within 300 days, or approximately September 1, 2003.

Plaintiff contends that he was merely laid off at this time.  Plaintiff argues that he interpreted the term "termination" to mean that he was merely laid off.  The Court declines to define "termination" so broadly under the circumstances of this case.

Plaintiff contends that the earliest he was informed was the May 15, 2003, letter in which Carl Suiter alluded to "your retirement."  The Court, however, finds that Plaintiff was aware that Lear considered him retired by November 12, 2002.  The May 15, 2003 letter written by Carl Suiter which Plaintiff refers was in response to Plaintiff's May 9, 2003 letter which Plaintiff provides "I am assuming at this point, nearly 8 months passing since my termination, that there is nothing for me in the way of employment at Lear."  (Defendant's Motion, Ex. F). Plaintiff further provided in his May 9, 2003 letter "I received an email response from Charlie that was very short saying that I had been terminated effective October 15th.  This was nearly mid-November."  (*Id.*).  Based on this correspondence, the Court finds that Plaintiff was aware that he had been terminated in mid-November, 2002.  Plaintiff further testified:

Q.  Was Lear still covering your benefits or had you been COBRA'd?

A.  I'd been COBRA'd, but I did not know - when I left on October 12th, I wasn't aware what my status was other than it was Charlie looking for work for me, and it wasn't until a month later, or very close to a month later, when Charlie was not answering my phone calls, that I sent an e-mail to Charlie and asked him what my status was.  I said I'm concerned about my insurance.  Am I on unpaid leave of absence?  What is my status? And the next day he e-mailed me back that you had been terminated as of October 15th and you should get something from COBRA any time.

13

Q.  And then you got a COBRA letter?

A.  Well, it wasn't even requested until after - I think it was the 12th of November that they decided I was terminated, so I didn't get my COBRA letter until it was later; it was in December.

(Plaintiff's Dep. at 157-158).  Notably, Plaintiff testified that he asked Charlie Ruda about his status at Lear and Ruda replied that he had been terminated.  If Plaintiff considered himself laid off, he would not have inquired about his status to Ruda.  Further, Ruda told Plaintiff in response to his inquiry that he had been terminated.  The Court finds that to infer that Ruda, in reality, meant that Plaintiff was merely laid off under these circumstances is untenable.  The Court finds that there is no probative evidence indicating that Plaintiff was merely laid off.  Instead, the record, including Plaintiff's own correspondence and testimony indicate that all parties involved considered him retired by at least mid-November 2002.  Therefore, the Court finds that his charge with the EEOC was untimely, and his ADEA claim is dismissed.

> **b.**     **Even if Plaintiff timely filed his EEOC Discrimination Charge, the Court still grants Defendant's Motion for Summary Judgment on Plaintiff's ADEA and ELCRA Claims.**

The Court considers both state and federal law in analyzing Plaintiff's discrimination claims in this action.  *Scudari,* 344 F.Supp.2d at 592 (citing *Radke v. Everett,* 442 Mich. 368, 382 (1993).  Under Michigan and Federal law, where there is no direct evidence to establish a question of fact on discriminatory intent, courts turn to the *McDonnell Douglas* burden shifting framework.  Under *McDonnell Douglas*, a plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence.  *McDonnell Douglas* 411 U.S. at 802; *Dubey v. Stroh Brewery Co.,* 185 Mich. App. 561 (1990).   If plaintiff succeeds in

14

establishing a prima facie case, the burden shifts to defendant to articulate some

nondiscriminatory reason for the adverse action. *St Mary's Honor Center v. Hicks,* 509 U.S. 502

(1993). Plaintiff must then prove that the reason put forth by the defendant was a mere pretext

for discrimination. *McDonnell Douglas,* 411 U.S. at 802. "It remains at all times the plaintiff's

burden to establish by a preponderance of the evidence that [his] age was 'determining factor' in

the [employment] decision." *Scuradi v. Monumental Life Ins. Co.,* 344 F.Supp.2d 584, 592

(citations omitted).

To state a *prima facie* case for age discrimination, the Plaintiff must show: (1) that he

was at least 40 years old; (2) he was subjected to an adverse employment action; (3) he was

qualified for the position; and (4) he was treated less favorably than similarly situated younger

employees. *Town v. Michigan Bell Telephone Co.,* 455 Mich. 688 (1997).

The Court grants Lear's Motion for Summary Judgment on Plaintiff's ADEA and

ELCRA claims. The Court finds that Plaintiff's age discrimination claims fail because of his

unique employment arrangement with Lear. The Court finds that Plaintiff's return to Lear after

he voluntarily retired was in a temporary capacity and Lear made no promise of continued

employment. For these reasons, as set forth below, the Court finds that Plaintiff has not

established an adverse employment action or that there was a similarly situated employee who

was treated less favorably because of her age.

The Court finds that Plaintiff's age discrimination claims fail because he has failed to

show that he suffered an adverse employment action. The Court finds that Plaintiff voluntarily

retired in 2002. The Court finds that when Plaintiff returned to Lear, the record indicates that he

was a temporary employee, and it was understood that he would return to his retired status at the

15

conclusion of these assignments.  Plaintiff argues that he never actually retired.  Plaintiff

contends that his Change in Status form was never processed and this shows that he never retired

in 2002.  (Plaintiff's Response, Ex. 4).  The Court, however, finds that the record is clear that

Plaintiff was retired in 2002 - Plaintiff, himself testified to this.  Plaintiff even attended his

retirement party.  (Plaintiff's Dep. at 11).  Because Plaintiff voluntarily retired in 2002, the Court

finds that he did not suffer an adverse employment action.

Plaintiff admitted that when he returned to Lear and accepted the Marlette position, he

returned in a temporary capacity.  (Plaintiff's Dep. at 115-116).  Plaintiff testified that he

understood that the terms of his employment with Lear required that he would return to his

retired status at the end of his temporary assignments.  (*Id.*).  Plaintiff further testified that when

he accepted Lear's offer to fill the assignment in Madisonville, he understood that his position

would end when a permanent human resource manager was found.  (Plaintiff's Dep. 135-136,

151).  On October 2, 2002, Plaintiff told Lear that he no longer could afford to retire and would

like another position.   Plaintiff testified:

> I said I couldn't afford to retire.  That - I said, you know, whenever there is an employee
> we don't want, we throw money at him.  The more undesirable you are, the more money
> you get.  How about taking care of the good guys.  I have been a good, loyal employee.  I
> have had Lear blood going through my veins.  How about could you give me my full
> pension at age 62 as though I was 65.

(*Id.* at 142).

Carl Suiter told Charlie Ruda to make it a priority to find Plaintiff a permanent position

with Lear:

> Q.  Did you have a conversation with Charlies Ruda about Mr. Reynolds' desire to stay
> on full time, permanently, with the company?
>
> A.  I instructed Charlie to do whatever we could to find a spot for him, if we could.

Q. To find a full-time, permanent spot?

A. Uh-huh.  If he could.

(Suiter Dep. at 33).   Plaintiff contends at this point he was a full time salaried employee, and

Lear chose, against his will, to retire him.  However, the Court finds that Plaintiff testified that

Ruda made no promises to him, and told him he would "see what we can do."  (*Id.* at 144, 145

152).  The Court finds that Plaintiff has failed to demonstrate that he was a full time salaried

employee in October, 2002.  Therefore, Plaintiff did not suffer an adverse employment action.

Further, even if Plaintiff were deemed a full time salaried employee after he returned in

2002, the Court finds that Plaintiff had legitimate options for continued employment.

Involuntary retirements are considered claims of constructive discharge.  *Scott v. Goodyear Tire*

*& Rubber Co.,* 160 F.3d 1121 (6th Cir. 1998).  In *Wilson v. Firestone Tire & Rubber Co.,* 932

F.2d 510 (6th Cir. 1991), the Court held that presenting an employee with legitimate options for

continued employment precludes a finding of constructive discharge, even if the offer of

employment is for a less prestigious position.  (*Id.* at 1128).  The *Wilson* Court held that the

plaintiff was offered legitimate options for continued employment when the defendant offered

him the choice of replacing any of three of his former subordinates or accept early retirement.

Plaintiff was asked if he would be interested in a permanent position at a joint-venture on

the East Coast.  (*Id.* at 160).  Plaintiff testified that he was not interested because the pay was too

low and the coast of living on the East Coast was too high.  (*Id.* at 54).  Carl Suiter testified to

this issue as follows:

Q. What efforts, if any, did Charlie Ruda make to find Mr. Reynolds a position at Lear
after October 2002?

A. I'm not clear on timing, but there were two things that were looked at.  One was in

17

Chicago, and one was a joint venture.

Q.  I'm sorry?

A.  A joint venture in Delaware I think it was....

Q.  And what was the issue in Chicago?  I'm sorry.

A.  I think Dick wasn't interested because the salary-level was too low.

Q.  Was this a Lear facility in Chicago.

A.  Uh-huh.

Q.  Do you recall what the position was?

A.  HR Manager.

Q.  And did you have a conversation with Mr. Reynolds about the position in Chicago?

A.  I do not remember a direct conversation.

Q.  Did you have a conversation with Mr. Reynolds about the joint venture in Delaware, I think you said?

A.  No.  I think that all went through Charlie, although I was the one orchestrating the joint venture one.

(Suiter Dep. at 34-35).

Plaintiff argues that because the joint-venture opportunity was with an entity other than Lear it does not "cover the Defendant's discrimination."  As stated above, the Court finds that Plaintiff did not suffer an adverse employment action because he did not have a continued expectation of employment.  However, the Court also finds that the evidence demonstrates, at a minimum, that Plaintiff was "offered an interview" for the Newark joint-venture position.  To this, Plaintiff testified:

Q.  When's the last conversation you had with Carl Suiter?

18

A.  It would have been when he offered me the position or an interview position with the Newark facility.

Q.  That's the one you turned down because it was a cut in pay and you'd have to relocate and it wasn't with Lear?

A.  Correct.

(Plaintiff's Dep. at 160).  The Court finds that the Delaware joint-venture was a legitimate option

for employment, particularly because Lear was under no obligation to permanently place

Plaintiff.  Further, the fact that it was a joint-venture and not a solely Lear position does not alter

this analysis because the record demonstrates that Lear had the power to hire for this position.

This is evidenced by the undisputed fact that Charlie Ruda at the direction of Carl Suiter, offered

Plaintiff, at minimum, an interview for the position.

The Court further finds summary judgment appropriate on Plaintiff's discrimination

claims because Plaintiff failed to establish that there was a younger similarly situated employee

who was treated less favorably than he.  Plaintiff sets forth Carrie Robards, 33 years old, who

was awarded the job as human resource manager for the Lear facility near Chicago, as a

similarly situated employee who was treated less favorably than Plaintiff because of his age.

The Court, however, finds that Plaintiff has not established that Carrie Roberts: (1) voluntarily

retired and later returned to Lear, (2) was offered and completed temporary assignments, and (3)

was given no promises that future permanent employment would be attained.  Conversely, Carrie

Robards was a full time salaried employee with Lear.  Accordingly, the Court finds that

Plaintiff's employment situation was unique and Carrie Robards was not a similarly situated

employee.  Therefore, for the reasons set forth above, Plaintiff has failed to establish a prima

facie case of age discrimination under the ADEA and the ELCRA.  Accordingly, the Court

grants Defendant's Motion for Summary Judgment on Plaintiff's ADEA and ELCRA Age

Discrimination claims.

**CONCLUSION:**

The Court grants Defendant's Motion for Summary Judgment in its entirety.

**SO ORDERED.**


s/Paul D. Borman_____
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  July 18, 2005

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
July 18, 2005.


s/Jonie Parker_____
Case Manager